UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

Jennifer L. Rapp,                                    12-cv-2743 (PJS/TNL)

                Plaintiff,

        v.                                           **REPORT AND RECOMMENDATION**

Carolyn W. Colvin,[1]
Acting Commissioner of Social Security

                Defendant.

---

Lionel H. Peabody, Esq., P.O. Box 10, Duluth, MN 55801-0010, for Plaintiff.

Ann M. Bildtsen, Assistant United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Defendant.
_____

TONY N. LEUNG, United States Magistrate Judge.

        Plaintiff Jennifer Rapp ("Rapp") disputes the Commissioner's denial of her applications for social security income ("SSI") and disability insurance benefits ("DIB"). Judicial review in the United States District Court for the District of Minnesota is proper under 42 U.S.C. §§ 405, 1383(c)(3). This matter is before the Court, United States Magistrate Judge Tony N. Leung, for a report and recommendation to the United States District Court on the parties' cross motions for summary judgment. *See*, 28 U.S.C. § 636(b)(1); D. Minn. L.R. 72.1-2. Based on the record and proceedings herein, **IT IS**

---

[1] Carolyn W. Colvin, Acting Commissioner of the Social Security Administration, is substituted as the defendant in this action pursuant to Federal Rule of Civil Procedure 25(d).

**HEREBY RECOMMENDED** that Plaintiff's motion for summary judgment be **GRANTED FOR REMAND**, and Defendant's motion for summary judgment be **DENIED**.

## I.     BACKGROUND

### A.     Procedural History

Rapp was 38 years old on the alleged disability onset date.  (Tr. 16, 245-52.)[2] She alleged disability from wrist injuries, chronic pain and depression. (Tr. 276, 320.) Rapp's application was denied initially and upon reconsideration.  (Tr. 134-38, 141-46.) She requested a hearing, and a hearing was held on January 14, 2009, before Administrative Law Judge ("ALJ") Michael Quayle.  (Tr. 149-50, 72-101.)  On April 16, 2009, ALJ Quayle denied Rapp's claim.  (Tr. 114-27.)  Rapp requested review of the ALJ's decision by the Appeals Council.  (Tr. 178-79.)

On August 19, 2009, the Appeals Council remanded for further consideration of the medical opinion evidence, the claimant's mental impairments, drug-seeking behavior, and review of additional relevant evidence that was submitted to the Appeals Council.  (Tr. 128-33.)  Thus, a second hearing was held before ALJ Roger Thomas on February 11, 2010.  (Tr. 24-71.)  ALJ Thomas denied Rapp's claim on April 21, 2010. (Tr. 7-23.)  Rapp requested review by the Appeals Council.  (Tr. 214-16.)  The Appeals Council denied review of the April 21, 2010 decision,[3] and the ALJ's decision became the final decision of the Commissioner of Social Security.  *See Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (Appeals Council's denial of review made the ALJ's decision

_____

[2] The Court uses the abbreviation "Tr." to reference the transcript of the Administrative Record, Doc. No. 7.

[3] The Appeals Court misidentified the date of the ALJ's decision as August 21, 2010. (Tr. 1.)

the final decision of the Commissioner).   Rapp initiated the present action for judicial review on October 26, 2012.

### B.    Employment History

Rapp was employed as a carpenter from May 1990 through February 1993.  (Tr. 283.)  She next worked as a job coach from April 1993 through December 1993.  (*Id.*)  Rapp was an emergency medical technician from June 1995 through March 1996.  (*Id.*)  She worked for various employers as a carpenter from April 1997 through October 2001, with a gap from August 2000 through April 2001.  (*Id.*)  Rapp then worked as a sales associate for nearly one year, beginning in August 2001.  (*Id.*)  She worked for only one week as a "gopher" in June 2003.  (*Id.*)  Rapp alleged her disability began on May 31, 2002, and her date last insured was September 30, 2006.  (Tr. 272.)

### C.    Medical Records

In October 2004, Rapp's new primary care physician, Dr. Ingrid Nisswandt-Larsen, referred Rapp to Dr. Thomas Elliott at Duluth Clinic for pain management consultation and participation in a pain management program.  (Tr. 374, 380.)  Rapp described her history of chronic right wrist pain following a work-related injury in May 1998.  (*Id.*)  Her pain had not improved after multiple injections and surgery.  (*Id.*)  Her right wrist pain was constant and extended to her hand, forearm and elbow.  (*Id.*)  Rapp was right-handed, and the pain interfered with writing and doing manual labor.  (*Id.*)  She used her left hand for most activities.  (*Id.*)  Using her thumb and wrist aggravated her pain, and using heat, ice and rest helped.  (Tr. 381.)  She did not have sensory abnormalities, but she believed her hand, thumb and fingers were weak.  (*Id.*)  Over the last several months, Rapp started to notice left wrist pain, intermittently as a dull ache.

3

(*Id.*)  She also had intermittent pain in her low back and neck.  (*Id.*)  Rapp said the following provided some degree of relief:  lying down, taking medication, distraction, drinking alcohol, getting away from people, walking, resting, taking a bath or applying heat, applying ice, holding the sore area, stretching, receiving massage and sleeping. (*Id.*)

Rapp lived alone in an apartment and could do household chores without difficulty.  (*Id.*)  She worked part-time in remodeling, primarily painting and drywall, for ten hours per week.   (*Id.*) Her pain interfered very little with leisure activities, relationships, or emotions.  (*Id.*)   It interfered somewhat with sleep.  (*Id.*)  She slept five or six hours at night but pain interrupted her sleep three or four times.  (Tr. 381-82.) Rapp could drive, shop, and do errands.   (Tr. 382.)   Her day usually consisted of sleeping, preparing meals, walking her dog, working, doing chores and errands, watching television and reading.  (*Id.*)  Her last physical therapy was several years earlier, and it had been helpful.  (*Id.*)  Steroid injections provided brief relief.  (*Id.*)  Rapp was taking hydrocodone three times a day, with no reported side effects.  (*Id.*)  Rapp started taking Lortab[4] for back pain in 1997.  (*Id.*)  She had no history of misuse or overuse of prescription drugs.  (*Id.*)  Before her right wrist surgery, she was diagnosed

---

[4] Lortab, a brand name for hydrocodone bitartrate and acetaminophen, is an opioid analgesic, indicated for relief of moderate to moderately severe pain, and it may be habit forming.   The most frequently reported side effects are light-headedness, dizziness, sedation, nausea and vomiting.  *Physician's Desk Reference* 3240-41 (59th ed. 2005).

with De Quervain's tenosynovitis.[5]  (*Id.*)  Codeine, Celebrex and Cyclobenzaprine were not helpful.  (*Id.*)

Rapp's motor examination was essentially normal, with very slight weakness in right hand grip and wrist and thumb extension on the right.  (Tr. 383.)  All other muscle groups of the upper and lower extremities were normal.  (*Id.*)  Sensory examination was normal with the exception of slight reduced sensation to light touch on the right wrist and forearm.  (Tr. 383-84.)  Rapp's mental status examination was normal.  (*Id.*)  Phalen's and Tinel's[6] signs were negative.  (Tr. 384.)  Rapp would enter the pain management program with rehabilitative goals.  (*Id.*)  She would discontinue hydrocodone and begin tramadol,[7] antidepressants and possibly gabapentin or other anticonvulsants.  (*Id.*)  In January 2005, Rapp was still refilling her prescription for Lortab.  (Tr. 387.)  In March, she continued on Lortab because she had dropped out of the pain program when her insurance would not cover it.  (Tr. 391.)

After therapy and injections failed to relieve Rapp's bilateral wrist pain, she saw Dr. Janus Butcher at Duluth Clinic on February 9, 2006.  (Tr. 414.)  Rapp was working in construction and had daily wrist pain.  (*Id.*)  Dr. Butcher diagnosed bilateral severe

---

[5] De Quervain's tenosynovitis is inflammation of the tendons of the first dorsal compartment of the wrist, diagnosed by a specific provocative test.  *Stedman's Medical Dictionary* 1795 (27th ed. 2000).

[6] Phalen's and Tinel's tests are used to detect the presence of carpal tunnel syndrome by manipulating the wrists and looking for signs of wrist pain or abnormal sensations in the fingers.  David A. Morton III, M.D., *Social Security Disability Medical Tests*, vol. 1, Ch. 1 §§ 1.20 and 1.26.

[7] Tramadol is similar to narcotic analgesics and is used to treat moderate to moderately severe pain.  Drugs & Medications – Tramadol Oral, WebMD available at http://www.webmd.com/drugs/mono-5239-TRAMADOL+-+ORAL.aspx?drugid=4398&drugname=Tramadol+Oral&source=0

recalcitrant DeQuervain's tenosynovitis and referred Rapp to Dr. Joe Henry for consideration of tenosynovectomy.[8]  (*Id.*)  Rapp was also given a right wrist cast.  (*Id.*)  Dr. Henry was surprised that Rapp had recurrent symptoms on the right wrist because, in his experience, release surgery for De Quervain's was successful without recurrence in most cases.  (*Id.*)  Nonetheless, he thought Rapp might benefit from a similar procedure on the left.  (*Id.*)  She underwent first dorsal compartment release on the left wrist on March 13, 2006.  (Tr. 453.)  On May 24, 2006, Rapp told Dr. Nisswandt-Larsen that she was doing "ok" but was going to look into SSI.  (Tr. 421.)  Rapp had increased pain post-operatively and had to take an increased dose of Lortab.  (*Id.*)  On March 31, 2007, Rapp underwent a consultative psychological examination with Dr. Marlin Trulsen in support of her social security disability claim.  (Tr. 499.)  Rapp drove herself to the appointment and had a slight odor of alcohol when she arrived.  (*Id.*)  She said she consumed the alcohol the previous night, and it would not affect her assessment.  (*Id.*)  Rapp had been diagnosed with depressive disorder on October 27, 2006.  (*Id.*)  She had been homeless for several years, just "floating" from friend to friend as long as she could stay with them.  (*Id.*)  She had an associate's degree in firefighting and technology.  (*Id.*)  She said her last job was at Home Depot in 2002, and she left because customer service was too stressful.  (Tr. 499-500.)

Rapp said her depression started in her early 20s.  (Tr. 500.)  She felt more isolated now and had crying episodes.  (*Id.*)  Her depression worsened when her father died in 2003, and her dog died in 2006.  (*Id.*)  She had no energy or motivation.  (*Id.*)  Having no work, no money and nowhere to live contributed to her depression.  (*Id.*)  She

---

[8] Tenosynovectomy is excision of a tendon sheath.  *Stedman's Medical Dictionary* 1795 (27th ed. 2000).

had counseling in the past but not presently.  (*Id.*)  She was taking Prozac for the last six to eight months, with some effectiveness.  (*Id.*)  She said she used alcohol once a week.  (*Id.*)  She admitted that she had five beers the night before the consultation.  (*Id.*)

Rapp said she did a lot of reading and also liked to take walks and garden in the summer.  (*Id.*)  On a typical day, she awoke at 5:00 a.m., had coffee, cleaned, watched television or walked, went outside, visited friends, tried to stay busy.  (Tr. 500-01.)  In the evening, she had dinner, talked on the phone and went to bed at 10:30.  (Tr. 501.)  Her social life was adequate, and she could do her own cleaning and shopping.  (Tr. 501.)  She could do "little batches" of gardening.  (*Id.*)  Dr. Trulsen diagnosed mild, recurrent major depressive disorder, with seasonal pattern; bereavement; dysthymic disorder, early onset; alcohol abuse with evidence of alcohol dependence.  (Tr. 502.)  He assessed a GAF score of 35. (*Id.*)   Dr. Trulsen opined that Rapp could carry out work-like tasks with reasonable persistence or pace, respond appropriately to brief and superficial contact with coworkers and supervisors, and tolerate stress and pressures typically found in entry-level work within an average to low average range.  (*Id.*)

The following month, Dr. Mario Zarama, a state agency physician, reviewed the medical records in Rapp's social security disability file and completed a Physical Residual Functional Capacity Assessment.  (Tr. 519-25.)  He opined that Rapp could occasionally lift twenty pounds, and ten pounds frequently; and she could sit, stand or walk for six hours each in an eight-hour workday.  (Tr. 519.)  She would also be limited to occasional handling (gross manipulation) and fingering (fine manipulation) bilaterally. (Tr. 519, 521.)

Dr. Dan Larson, another state agency physician, also reviewed Rapp's social security disability file.  (Tr. 504-17, 526-29.)   He diagnosed Rapp with an affective disorder and substance addiction.  (Tr. 504.)  On April 20, 2007, he opined that Rapp had moderate difficulties maintaining concentration, persistence or pace.  (Tr. 514, 526-27.)  She was limited to routine, repetitive, three to four step and limited detailed tasks; superficial contact with co-workers and the public; and she would need a reasonably supportive supervisory style.  (Tr. 528.)

On November 11, 2008, Rapp told Dr. Nisswandt-Larsen she was out of Lortab and in withdrawal.  (Tr. 605.)  A few months later, Dr. Nisswandt-Larsen wrote a letter on Rapp's behalf.  (Tr. 596-97.)  She explained that Rapp had developed chronic neuropathic pain after wrist surgeries in 1999 and 2006, extending up both arms.  (Tr. 596.)  Many treatments had failed, and she was on medications.  (*Id.*)  Rapp recently started taking antidepressants for situational depression.  (*Id.*)  She opined Rapp had a permanent disability of neuropathic pain syndrome and would be unable to work in the future for "any sustainable work."  (*Id.*)  She also completed a form concerning Rapp's hand and wrist problems.  (Tr. 598.)  It was her opinion that Rapp's pain was severe to extreme.  (*Id.*)  Rapp, however, could constantly use her right hand for fine and gross manipulation.  (*Id.*)  She could only occasionally use her left hand for fine and gross manipulation.  (*Id.*)  Somewhat inconsistently, Dr. Nisswandt-Larsen indicated Rapp was unable to perform fine and gross movements effectively for activities such as preparing a simple meal, feeding herself, caring for personal hygiene, handling papers and files, and placing files in a cabinet at or above waist level.  (*Id.*)

Dr. Nisswandt-Larsen also completed a form concerning Rapp's depression.  (Tr. 599.)  She opined Rapp was mildly limited in activities of daily living, and she had moderate difficulties in maintaining social functioning.  (*Id.*)  She believed that Rapp's deficiencies in concentration, persistence or pace would frequently result in her failure to complete tasks in a timely manner.  (*Id.*)  Rapp was not markedly impaired in any "work limitations related to psychiatric state," but she was moderately impaired in four out of twenty mental work-related tasks.  (Tr. 599-600.)

Rapp did not show improvement in her pain, so she was referred for a physical medicine rehabilitation consultation with Dr. Timothy Morton in May 2009.  (Tr. 625-27.)  Dr. Morton noted Rapp had quit a past chronic pain program in a disagreement over pool therapy.  (Tr. 625.)  Her current medications were Lortab, Neurontin [gabapentin], which helped her sleep but not her pain, and Vitamin B12 injections.  (Tr. 626.)  Rapp smoked daily and drank a six-pack of beer per week.  (*Id.*)  She did not exhibit any excessive pain behaviors, but she was very guarded with her wrists.  (*Id.*)  There were no skin changes to suggest complex regional pain syndrome.  (*Id.*)  Manual muscle testing was limited by her discomfort, but she appeared to have normal functional strength.  (*Id.*)  X-rays of her wrists were last taken in November 2005, and showed no evidence of fracture, and only mild arthritic changes.  (*Id.*)  She was appropriate for the pain program.  (*Id.*)  She could not return to her past work in construction or carpentry, and if there were questions of her performance of other functional tasks in a work environment, she could have a functional capacity evaluation.  (Tr. 626-27.)

On June 4, 2009, Dr. Nisswandt-Larsen wrote a letter supporting appeal of the denial of Rapp's social security disability claim.  (Tr. 612-13.)  After describing Rapp's

medical history, she opined that Rapp was very motivated to return to work but could not work due to severe pain.  (Tr. 612.)   She opined that Rapp's impairment had significantly affected her life in that she gave up hobbies of camping, fishing and gardening, and she had not been able to use a computer for a year. (Tr. 613.) She had not volunteered at an animal shelter, as desired, because she could not use her hands. (*Id.*) Dr. Nisswandt-Larsen found Rapp to be honest and compliant with treatment.  (*Id.*) Rapp was dependent on opioids because of her pain, but she had not shown issues with addiction.  (*Id.*)   She opined that Rapp could not engage in substantial gainful activity due to her arm pain.  (*Id.*)

By August 19, 2009, Rapp was taking twelve Lortab pills per day.  (Tr. 619.) Rapp had worked in a community garden over the summer, and it caused a pain flare. (*Id.*)  Dr. Nisswandt-Larsen was unhappy that Rapp had increased her medication on her own, violating her pain contract.  (*Id.*)   She was uncomfortable continuing to prescribe narcotics.  (*Id.*)  A week later, Dr. Nisswandt-Larsen was willing to give Rapp another chance because she had cut back on Lortab and had not violated her contract in the past.  (Tr. 617-18.)

Rapp's symptoms were unchanged in October 2009.  (Tr. 616.)  Her wrists were tender, and she had pain with range of motion.  (*Id.*)   Due to possible underlying depression, Rapp was prescribed Zoloft.  (*Id.*)  On January 9, 2010, Rapp said she felt better off antidepressants; they actually made her more depressed.  (Tr. 645.)  Rapp's pain was still at a severity level of eight or nine out of ten, lowered to five out of ten with medication.  (*Id.*)  Dr. Nisswandt-Larsen recommended a trial of methadone, but she was not sure it would work with neuropathic pain.  (Tr. 646.)

After Rapp's administrative hearing, the ALJ submitted interrogatories to Dr. Andrew Steiner, who had testified at the hearing.  (Tr. 665.)  On March 11, 2010, Dr. Steiner opined that Rapp was capable of light exertional work with no power gripping or power tools, and no continuous upper extremity activities.  (Tr. 667.)

### D.     Function Reports

Rapp completed a function report in support of her social security disability claim on March 20, 2007.  (Tr. 308-15.)   She described her daily activities as personal grooming, watching television, reading, checking the Internet, eating when hungry, and walking once a week.  (Tr. 308.)  It was difficult for her to dress and groom.  (Tr. 309.) She prepared easy meals, and every task took longer than before her injury.  (Tr. 310.) She dusted once a month and had help from a friend with her laundry.  (*Id.*)  She went outside several times a week and could walk and drive a car.  (Tr. 311.)  She wore a brace on one or both wrists to drive.  (*Id.*)  She went shopping once or twice a month. (*Id.*)  She read and watched television more than in the past.  (Tr. 312.)  She had dinner with her family once a month and walked to a park once a week.  (*Id.*)   Rapp has chronic pain in her hands and arms that caused her to drop even light weight items.  (Tr. 313.)   She could not concentrate, but she could follow instructions, get along with authority figures, and manage stress and changes in routine.  (Tr. 313-14.)

A friend of Rapp's, Jackie Harris, completed a third-party function report in support of Rapp's social security disability claim on March 20, 2007.  (Tr. 300-07.)  She had some difficulty with self-care, and it took her longer to shower than in the past.  (Tr. 300-01.)  Rapp had trouble sleeping at night and got out of bed two or three times.  (*Id.*) Her wrist pain made it difficult for her to cook.  (Tr. 302.)  Rapp loved to read, and she

watched television out of boredom because she could not work.  (Tr. 304.)  Rapp had trouble using a mouse for a computer, so she did not go online very often.  (*Id.*)  She volunteered to walk dogs at an animal shelter after her dog died in November 2006, but she had trouble getting to the shelter because she did not have any money.  (Tr. 301.)

### E.   Hearing Testimony

After the Appeals Council vacated the first ALJ decision in this matter and remanded for further proceedings, Rapp testified at a hearing before ALJ Roger Thomas on February 11, 2010.  (Tr. 24-58.) Rapp completed high school and two years of college, with a degree in fire technology and administration.  (Tr. 33.)  Rapp hurt her right wrist in an accident in 1998, eventually leading to surgery.  (Tr. 42.)  Her right wrist pain was fairly severe from 2002 through 2006.  (Tr. 46.)  She had at least fifteen cortisone shots, several rounds of physical therapy, and splinting and casting of her wrist without success.  (*Id.*)  After her injury, Rapp could only sleep a few hours before pain awoke her.  (Tr. 50-51.)  Her sleep has decreased over time, and her pain worsened.  (Tr. 51.)  She filed a workers' compensation claim at the time of the accident, and it has been resolved.  (Tr. 44-45.)  Her left wrist pain started when she went back to work after her 1998 accident.  (Tr. 49-50.)

Rapp's last significant job, thirty hours per week, was in 2002 at Home Depot. (Tr. 35-36.)  In contrast to an earlier statement, she said she quit because she could not handle the weight of the materials she was required to carry.  (Tr. 36.)  When asked to comment on a medical record suggesting Rapp did construction work in 2006 or 2007, Rapp could not remember the last time she did construction.  (Tr. 39.)

On an average day in 2006, on a scale of one to ten, Rapp's pain was seven in

severity. (Tr. 46-47.)  Her pain varied throughout the day, with episodes of shooting pain from her thumb to her elbow and shoulder, occurring a few times a day and lasting up to a couple minutes.  (Tr. 47.)  The pain sometimes made her cry.  (Tr. 47-48.)  She constantly had dull throbbing pain at a level five out of ten, with shooting pain up to a level nine, in both arms.  (Tr. 48-49.)  Some days, Rapp did not want to get out of bed, and she could go days without showering.  (Tr. 45.)  She kept her shoes permanently knotted so she could slide them off and on.  (*Id.*)  It had been years since she last tied her shoes.  (*Id.*)

At the time of the hearing, Rapp lived with another disabled individual who did not require any help from Rapp.  (Tr. 31-32.)  In response to whether she could bathe, dress, feed herself or similar activities, Rapp said she had good days and bad days.  (Tr. 32.)  Rapp's roommate did most of their cooking.  (Tr. 34.)  Rapp did not do dishes or vacuum.  (*Id.*)  She had assistance with grocery shopping once a month.  (Tr. 34, 53.)  Rapp dropped things often due to pain in her wrists.  (Tr. 34-35.)  She had a driver's license, but she was not currently driving, because it was too hard to hold the steering wheel.  (Tr. 32, 53.)  She used wrist splints most of the day but not always at night.  (Tr. 37.)  Rapp did home exercises for her wrists a couple times a week.  (Tr. 43.)  She was a member of a community garden for fifteen years before she gave it up.  (Tr. 56.)  She last gardened three or four years ago.  (*Id.*)

Rapp tried Wellbutrin for depression and smoking cessation, but it actually made her more depressed.  (Tr. 35.)  She tried some other antidepressants that also did not work.  (*Id.*)  She was never hospitalized for psychiatric reasons.  (*Id.*)  She could not concentrate long enough to watch a half-hour television show.  (Tr. 54.)  She read for

only ten or fifteen minutes at a time because she could no longer concentrate.  (*Id.*)  In the last few years, depression caused her to stay in bed ten or twelve days per month.  (Tr. 55-56.)  She tried to make herself get up and read or listen to the radio.  (Tr. 56.)  Rapp enjoyed working but cannot imagine returning to even the lightest duty work because she could not concentrate anymore.  (Tr. 58.)  Rapp did not agree with Dr. Nisswandt-Larsen's opinion that she could constantly use her right hand for fine manipulation and occasionally use her left hand for fine manipulation.  (Tr. 40-41.)  Rapp used alcohol but not on a regular basis, only a beer or two on the weekend.  (Tr. 33-34.)

Ed Utities testified at the hearing as a vocational expert.  (Tr. 58-68.)  The ALJ asked Utities to assume an individual aged from 38 to 46 years, with fourteen years of education and Rapp's work experience.  (Tr. 61.)  The hypothetical person was diagnosed with past alcohol abuse, opioid dependency, depression, bereavement, and PTSD.  (*Id.*)  She also had arm, wrist and hand pain, a history of right wrist surgery in 1998, left wrist surgery in 2006, and treatment with injections, braces, pool therapy and physical therapy.  (*Id.*)  She had a ganglion cyst and DeQuervain's tenosynovitis.  (Tr. 62.)  She was limited to light work, lifting up to twenty pounds occasionally, and ten pounds frequently.  (*Id.*)  She did not have limitations for being on her feet.  (*Id.*)  She was restricted to no more than occasional fine and gross manipulation with the left hand, and constant gross and fine manipulation with the right hand.  (*Id.*)  She was further restricted to routine, repetitive, three to four step tasks and instructions, with only superficial contacts and no sustained close contact with others in a work setting, and in a setting where alcohol and drugs were not sold, served or readily available.  (Tr. 62-

63.)

Utities testified that such a person could not perform Rapp's past work.  (Tr. 63.)  As to other jobs such a person could perform, Utities testified there were sedentary and light jobs that fit the nonexertional impairments, but he questioned whether the hand restrictions would preclude those jobs.  (*Id.*)  There were numerous light assembly jobs working with smaller products, but they would require frequent use of the hands, as opposed to occasional.  (*Id.*)  If the person could use the non-dominant hand in a bracing fashion, the person could perform assembly with the dominant hand, but the non-dominant hand would be used frequently in a bracing fashion.  (Tr. 64.)

The ALJ asked whether there were any light inspection jobs that required less work with the hands.  (Tr. 64-65.)  Utities testified the only job that might fit was surveillance system monitor, a sedentary position that did not require reaching, handling, and fingering as primary demands.  (Tr. 65.)  There were 500 such jobs in Minnesota.  (*Id.*)  Utities said his testimony was consistent with the Dictionary of Occupational Titles ("DOT").  (Tr. 66.)  Utities agreed that the job of surveillance system monitor required high levels of concentration.  (Tr. 67.)  In response to the question whether the surveillance system monitor job "[m]ay not be indicated for somebody that has difficulty concentrating because of chronic pain issues?" Utities responded "[c]ould." (Tr. 68.)

### F.    ALJ's Decision

On April 21, 2010, ALJ Thomas made the following findings and conclusions on Rapp's claim:

> 1.  The claimant meets the insured requirements of the Social Security Act through September 30, 2006.

2.  The claimant has not engaged in substantial gainful activity since May 31, 2002, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*). . . .

3.  The claimant has the following severe impairments: wrist tendonitis status post surgery, with forearm pain, elbow epicondylitis, DeQuervain's diagnosis, depression, posttraumatic stress disorder, alcohol abuse, and opiate dependence.  (20 CFR 404.1502(d) and 416.920(c)). . . .

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.926, 416.920(d), 416.925 and 416.926). . . .

5.  . . . [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except involving constant right hand fine and gross manipulation, occasional left hand fine and gross manipulation, routine repetitive three to four step tasks/instructions, superficial contact with others, no sustained close contact with others in a work setting, and a work environment free of alcohol and drugs. . . .

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965). . . .

7.  The claimant was born on September 17, 1963 and was 38 years old, which is defined as a younger individual, on the alleged disability onset date.  (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969 and 416.969(a)). . . .

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 31, 2002, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-18.)

The ALJ found Rapp did not meet or equal a listed impairment for a mental disorder under Listings 12.04 affective disorders, 12.06 anxiety-related disorders or 12.09 substance abuse disorders, because she did not meet the required severity level under the "paragraph B" criteria[9] of the listings. The ALJ determined that Rapp had mild limitations in daily activities, despite the difficulty she described in caring for her personal hygiene, preparing simple meals, dusting, and grocery shopping. (Tr. 13.) She had moderate difficulties in social functioning consistent with her ability to maintain stable interpersonal relationships, go in public unaccompanied, and because she had no history of social isolation. (*Id.*) She also had moderate, as opposed to mild or marked, difficulties in concentration, persistence or pace, based on her logical goal-directed thought process and intact memory in a psychological evaluation, and her ability to read, watch television, and handle finances and medications. (*Id.*) She did not have any episodes of decompensation. (*Id.*) In making these findings, the ALJ

---

[9] To meet or equal Listings 12.04, 12.06 or 12.09, under the paragraph B criteria, the claimant must have marked limitations in two of the following: daily activities, maintaining social functioning, or maintaining concentration, persistence or pace; or marked limitations in one of those categories with repeated episodes of decompensation of extended duration. 20 C.F.R. § 404, Subpt. P, Appendix 1, § 12.04(B); 12.06(B) and 12.09(B).

discounted the fact that Dr. Trulsen assessed Rapp with a GAF score of 35, indicative of impairment in reality testing or communication or a major impairment in several areas, because the ALJ found the GAF score inconsistent with Dr. Trulsen's clinical findings, and his assessment of claimant's work abilities. (*Id.*)

In assessing Rapp's RFC, the ALJ discounted Rapp's subjective complaints; primarily that she was unable to work due to chronic pain and depression. (Tr. 14-15.) First, the ALJ did not find Rapp's subjective complaints consistent with the objective evidence. (Tr. 15.)  She had wrist tendonitis after surgery with forearm pain, elbow epicondylitis and DeQuervain's diagnosis. (*Id.*)  She injured her right wrist in 1998, with surgery in February 1999, but she continued to report chronic pain. (*Id.*)  Then, she developed left wrist pain and underwent surgery in March 2006, also reporting ongoing pain in the left wrist. (*Id.*)  Examination findings generally included tenderness, variable strength with functionality, normal circulation, no atrophy, no consistent loss of range of motion, and no consistent sensory loss. (*Id.*)  Rapp's pain was extensively treated with narcotics, with no reports of side effects. (*Id.*)  In the record, there was concern over her possible overuse of medication, with early refill requests, but with some reports of improvement, indicating prescription medication could control the severity of her symptoms. (*Id.*)

As to Rapp's mental impairments, the ALJ noted Rapp did not have improvement with antidepressant medication, but she did not seek any specialized treatment and did not decompensate. (*Id.*)  The ALJ did not find credible Rapp's allegations of inability to make sandwiches, cut food or use a computer, based on her lack of clinical findings to support such claims. (*Id.*)  Due to Rapp's marginal history of employment, and her

failure to make a significant attempt to return to work or seek vocational or rehabilitation training, the ALJ found she did not have a strong motivation to return to work.  (Tr. 15-16.)

## II.    DISCUSSION

### A.    Standard of Review

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  "'Substantial evidence on the record as a whole' . . . requires a more scrutinizing analysis."  *Id.* (quotation omitted).  In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  Yet, the Court must consider evidence supporting and detracting from the Commissioner's decision.  *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006).

To be entitled to benefits, a claimant must be disabled as defined in the Social Security Act.  42 U.S.C. § 416(i)(1).  A "disability" is an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  *Id.*; *and see*, 20 C.F.R. §§ 404.1505 and 416.905.  The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of

the Social Security Act.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).  The five steps are (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or medically equals a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) based on his residual functional capacity ("RFC"), whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy.  *Id.* at §§ 404.1520(a)(4)(i-v) and 416.920(a)(4)(i-v).  The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner.  *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. §§ 404.1512, 416.912; *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991.)

When there is medical evidence of drug addiction or alcoholism, there are additional steps in evaluating disability.  20 C.F.R. §§ 404.1535, 416.935.  "If the gross total of a claimant's limitations, including the effects of substance use disorders, suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent."  *Brueggemann v. Barnhart*, 348, F.3d 689, 694 (8th Cir. 2003).  The ALJ must make the initial disability determination without deducting "the assumed effects of substance use disorders."[10]  *Id.*

**B.    Issues**

---

[10] Here, the ALJ found that Rapp had medically determinable impairments of alcohol abuse and opioid dependence at steps two and three of the evaluation process.  (Tr. 12-13.)  The ALJ did not cite the regulation concerning drug addiction or alcoholism, but the Court assumes the ALJ determined Rapp was not disabled considering the gross total of her limitations, including the effects of substance use disorders.  *See Fastener v. Barnhart*, 324 F.3d 981, 986 (8th Cir. 2003) (affirming where ALJ failed to make clear that she found the sum of the claimant's impairments did not amount to disability, even considering alcohol abuse as one of the impairments.)

Rapp contends the ALJ failed to include, in his hypothetical question to the vocational expert, a specific limitation on her concentration, even though the ALJ determined that Rapp had moderate difficulties maintaining concentration, persistence or pace.  The vocational expert testified that the occupation surveillance system monitor was the only job that fit the ALJ's hypothetical vocational question regarding a person with Rapp's RFC.  On cross-examination, the vocational expert testified that the job required high levels of concentration.  Based on this testimony, the ALJ concluded Rapp could work as a surveillance system monitor.  Rapp contends that the definition of surveillance system monitor in the DOT indicates that it requires constant attention and concentration for monitoring, observing, and maintaining surveillance.

Rapp also asserts that the surveillance system monitor position requires a reasoning development level of 3, according to the DOT.  Rapp argues this is inconsistent with a work restriction to routine, repetitive, three to four step tasks, which would equate to a reasoning level of one or two.  Because the VE testified that a person with this work limitation could perform the job of surveillance system monitor, and he did not explain the conflict between his testimony and the DOT, Rapp contends remand is necessary.

The Commissioner asserts the ALJ was not required to include the words "moderate difficulties in concentration, persistence or pace" in the hypothetical question to the VE.  The Commissioner contends it was sufficient for the ALJ to include Dr. Larson's RFC opinion in the hypothetical question to the VE, because it captured the concrete consequences of Rapp's mental impairments.  In other words, her difficulties in

concentration, persistence or pace were adequately described by limiting her to routine, repetitive, three-to-four step tasks and instructions.

The Commissioner contends the VE's testimony that a surveillance system monitor requires a high level of concentration does not affect his testimony that a person who was limited to routine, repetitive, three-to-four step tasks and instructions could perform that job. The Commissioner also argues that the reasoning level of three required for the job is not beyond a person who is restricted to simple, repetitive tasks. The Commissioner, citing the DOT, asserts that reasoning level three requires the application of "commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and the ability to] [d]eal with problems involving several concrete variables in or from standardized situations." Thus, the Commissioner contends there is no conflict between the DOT and the VE's testimony.

In reply, Rapp asserts the key issue is that a person who has moderate difficulties in concentration, persistence or pace cannot perform a job that requires high levels of concentration, as the VE described the job of surveillance system monitor. Rapp argues that limitation to routine, repetitive, three to four step tasks says nothing one way or the other about whether the person can sustain concentration, the very essence of the job.  Noting a split in authority, Rapp asserts it is not necessary to determine that a reasoning level of three exceeds the ability to perform routine, repetitive, three-to-four step tasks and instructions, but that it is beyond Rapp's ability in the circumstances presented here.

### 1.      Inclusion of the Concrete Consequences of the Claimant's Impairments in the Hypothetical Question

"The Commissioner may rely on a vocational expert's response to a properly formulated hypothetical question to show that jobs a person with the claimant's RFC can perform exist in significant numbers." *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005).  "A hypothetical question is properly formulated if it sets forth impairments "supported by substantial evidence in the record and accepted as true by the ALJ."  *Id.* (quoting *Davis v. Apfel,* 239 F.3d 962, 966 (8th Cir.2001).  The claimant's impairments do not have to be described by diagnostic terms in the RFC, but the hypothetical question must "capture the concrete consequences" of the impairments.  *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006).  The ALJ captures the concrete consequences of a claimant's mental impairments by describing the claimant's RFC in terms of limitations on specific work-related mental activities.  Social Security Ruling ("SSR") 96-8P, 1996 WL 374184, at *4 (S.S.A. July 2, 1996).

Here, the ALJ considered the severity of Rapp's mental impairments under the paragraph B criteria of listings 12.04, 12.06 and 12.09, and determined that Rapp has moderate difficulties in concentration, persistence or pace.  (Tr. 13, 15.)  The finding of moderate difficulties in concentration, persistence or pace is not part of the RFC, as it is not an assessment of specific mental work-related activities, and it is not required to be included in the hypothetical question posed to the vocational expert at steps four and five of the disability evaluation.  *See*, *Alvarez v. Astrue*, Civil Action No. 11-2512-JWL, 2012 WL 3441904, at *19 (D. Kan. Aug. 14, 2012) ("an ALJ should not state a mental RFC in terms of the four functional areas [of the paragraph B criteria], but should make a function-by-function assessment of each of the mental work-related mental activities

relevant to the case at hand."); *see also*, SSR 96-8P, 1996 WL 374184, at *4 (S.S.A. July 2, 1996).

In *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001), the Eighth Circuit held that where a state agency consultant determined that the claimant's difficulties in concentration, persistence or pace limited the claimant to simple, routine, and repetitive tasks, the ALJ adequately captured the limitations caused by the impairment by including simple, routine, repetitive tasks in the hypothetical question. In *Howard*, the claimant's impairment of borderline intellectual functioning was adequately accounted for by describing the claimant as capable of doing simple work, and there were no other mental impairments that caused limitations in that case. *Id. Howard* is distinguishable because Rapp suffers from different mental impairments.

In this case, Dr. Larson opined that Rapp had affective (depression) and substance abuse disorders, and these disorders caused moderate difficulties in maintaining concentration, persistence or pace. (Tr. 514.) In assessing Rapp's RFC, Dr. Larson opined that Rapp had the mental capacity to concentrate on, understand, remember and carry out routine, repetitive and limited detail instructions and tasks. (Tr. 528.) This was based on Dr. Larson's findings, in the agency's Mental Residual Functional Capacity Assessment form,[11] that Rapp was moderately limited in the ability

---

[11] The form is identified as FORM SSA-4734-F4-Supp (10-2004). (Tr. 526.) This form contains an instruction to evaluate each mental activity "within the context of the individual's capacity to sustain that activity over a normal workday and workweek, on an ongoing basis." (*Id.*) The Commissioner's Policy Operations and Manual of Systems ("POMS"), an internal employee guidance manual, instructs that a "reviewing source should check 'moderately limited'" on the Functional Capacity Assessment form (Form SSA-4734-F4-Sup) "when the evidence supports the conclusion that the individual's capacity to perform the activity is impaired." *Serna v. Astrue*, No. CV 08-01673-VBK, 2008 WL 5179033, at *3 (C.D. Cal. Dec. 9, 2008) (quoting POMS [present version

to understand, remember and carry out detailed instructions; moderately limited in the ability to maintain attention and concentration for extended periods; and moderately limited in the ability to work with others without being distracted by them.   (Tr. 526.) Concentration, persistence or pace is a term defined in the regulations.   The phrase "refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. 404 Subpart P, Appendix 1, §12.00(C)(3).   The regulation further provides, "[w]e must exercise great care in reaching conclusions about your ability or inability to complete tasks under the stresses of employment during a normal workday or work week . . . . We must assess your ability to complete tasks by evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis."   *Id.*

The ALJ incorporated Dr. Larson's specific work-related limitations into his RFC finding and into the hypothetical question to the VE, but Dr. Larson failed to include in his mental RFC opinion any limitation on the period of time that Rapp could maintain attention and concentration without requiring a break.   Given Dr. Larson's finding that Rapp had depression and substance abuse disorders with moderate limitations in the ability to maintain attention and concentration for extended periods, in combination with other evidence in the record of Rapp's chronic pain affecting her concentration, the ALJ's hypothetical question did not adequately capture the consequences of Rapp's impairments.   *See*, *Newton v. Chater*, 92 F.3d 688 (8th Cir. 1996) (limiting claimant to simple work was insufficient to capture concrete consequences of claimant's

available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510063]).   POMS provides that the extent of the limitation should be set out in narrative format in the form.   *Id.*

deficiencies in concentration, persistence or pace); *Bourgoyn v. Barnhart*, No. Civ. 01-1377 JRT/FLN, 2002 WL 31185883, at *4 (D. Minn. Sept. 30, 2002) (remanding because hypothetical question did not contain limitation based on deficiencies in concentration, persistence or pace); *Pritchett v. Astrue*, No. C09-2026, at *13 (N.D. Iowa Feb. 10, 2010) (same).  This case should be remanded for the ALJ to determine how long Rapp can sustain concentration and attention to perform the type of tasks otherwise described by Dr. Larson, and for the ALJ to include the finding in the hypothetical question to a vocational expert.

The ALJ relied on the response of a vocational expert to a hypothetical question that did not contain all of the concrete consequences of the claimant's impairments. When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence." *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996).  Therefore, remand is required for the ALJ to pose a proper hypothetical question and make a determination of whether Rapp can perform her past relevant work or any other work that exists in significant numbers in the national economy.

### 2.    Remaining Arguments

Under the circumstances, this Court need not reach the issues of whether the vocational expert's testimony was inconsistent with the Dictionary of Occupational Titles and whether the vocational expert explained the reason for the conflict.

## III.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS RECOMMENDED THAT**:

1.    Plaintiff's motion for summary judgment (Doc. No. 13) be **GRANTED FOR REMAND**, and this case be remanded for further proceedings consistent with this Report and Recommendation pursuant to Sentence Four of 42 U.S.C. § 405(g);

2.    Defendant's motion for summary judgment (Doc. No. 15) be **DENIED**; and

3.    If this Report and Recommendation is adopted, that judgment be entered and the case dismissed.

DATE:   February 10, 2014

____s/Tony N. Leung_____
TONY N. LEUNG
United States Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.   This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.   Written objections must be filed with the Court before February 25, 2014.